Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Leland H. Belew (SBN 293096)
leland@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:	(415) 986-1400
Facsimile:	(415) 986-1474

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE AMATRUDA,<br><br>Plaintiff,<br><br>vs.<br><br>WERNER (FID) CO., INC., and OLD LADDER CO. f/k/a WERNER CO.,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christine Amatruda ("Plaintiff"), by and through undersigned counsel, brings this Complaint for damages against Defendants Werner (FID) Co., Inc., and Old Ladder Co. f/k/a Werner Co. (collectively, "Defendants" or "Werner"), and alleges the following:

## NATURE OF THE CASE

1. This is an action for damages suffered by the Plaintiff as a direct and proximate result of Defendants' wrongful and negligent conduct in connection with the design, development, manufacture, testing, distribution, supply and/or sale of the Keller brand, Commercial Type II Model No. 706 aluminum ladder ("Ladder").

2. Plaintiff brings this action to redress injuries she suffered when the subject Ladder buckled, throwing her to the ground.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are incorporated in, and/or maintains their principal place of business, outside of California, the state in which Plaintiff resides.

4. The amount in controversy exceeds $75,000, exclusive of interest and cost.

5. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, a substantial part of the events giving rise to the claim occurred within the Northern District of California.

**PARTIES**

7. Plaintiff is a competent individual over the age of eighteen and is a resident of Berkeley, California.

8. Plaintiff brings this action for injuries she sustained when the Ladder designed, manufactured, tested, distributed, supplied, and/or sold by Defendants buckled while being used by Plaintiff in its intended manner.

9. Defendant Werner (FID) Co., Inc. is incorporated in the state of Pennsylvania, with its principal place of business in Greenville, Pennsylvania.

10. Defendant Old Ladder Co. f/k/a Werner Co. is incorporated in the state of Pennsylvania, with its principal place of business in Greenville, Pennsylvania.

11. Through various divisions and under various labels, including the Keller brand, Defendants develop, design, test, manufacture, advertise, distribute, supply, and sell goods—including Ladders—throughout the United States.

12. Defendants transacted and conducted business within the State of California that relates to the allegations in this Complaint. Defendants derived substantial revenue from goods and

products used in the State of California.  Defendants expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.  Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, distributing, supplying, and/or selling Ladders such as the one that caused Plaintiff's injuries.  Defendants are authorized to do business in the State of California and derive substantial income from doing business in this state.  Defendants purposefully availed themselves of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.  Defendants developed, designed, manufactured, distributed, supplied, and/or sold these Ladders with full knowledge of their dangerous and defective nature.

13. Plaintiff is informed and believes, and thereon alleges, that each Defendant is, and at all times material herein was, commonly owned and controlled, and was the agent, alter-ego, or other representative of the other Defendant.  Plaintiff is informed and believes, and thereon alleges, that each of the Defendants committed the acts and omissions herein alleged within the course and scope of their agency, representative or employment capacity and with the full knowledge, consent, authority and ratification of the other Defendant named herein.

14. Plaintiff is informed and believes, and thereon alleges, that each Defendant is, and at all times material herein was, acting in concert and combination with the other Defendant pursuant to a common plan and course of conduct and is jointly and severally liable for the acts or conduct of the other Defendant.

## FACTUAL ALLEGATIONS

*The Incident*

15. On September 30, 2017, Plaintiff retrieved her Keller brand six-foot aluminum step Ladder, Commercial Type II Model No. 706, from its enclosed storage area.

16. Plaintiff arranged the Ladder on the concrete sidewalk underneath a hallway window in her house.  She opened the Ladder and locked the lock spreaders on both sides of the Ladder so that all four legs were level on the concrete walkway.

17. Plaintiff climbed onto the Ladder.  She was holding the top of the Ladder with her left hand, while her right hand held the handle of a broom (for use in brushing cobwebs from the

window). Plaintiff did not have any other equipment in hand, or attached to her, nor were any items attached to the step Ladder at the time of the incident. Plaintiff kept both of her feet on the ladder step the entire time.

18. After less than five minutes on the Ladder, without any warning or indication, the Ladder suddenly collapsed when its right front side leg, step and diagonal brace buckled and failed.

19. Plaintiff fell backwards and sideways as the Ladder collapsed. Her head struck the concrete walkway, and she sustained heavy bruising on her body, and a strained chest muscle.

20. Plaintiff is unsure whether she lost consciousness, but once she regained her senses, she struggled to retrieve her cell phone to call her husband. Plaintiff was very scared, dizzy, and in pain. Plaintiff was frightened and wary of movement, but relocated inside her home so she could apply ice to the swelling on her skull.

21. When her husband returned home, about ten minutes after calling him, he took her immediately to urgent care, and then to the emergency room for cranial scans.

***Plaintiff's Initial Diagnosis and Injuries***

22. Plaintiff was initially diagnosed with a concussion, and over the following weeks she suffered increasing head and body pain. She constantly applied ice to her head and bruised muscles, and woke several times each night due to the pain.

23. Plaintiff visited her primary care physician within a week of the concussion, and several times thereafter as her symptoms did not lessen. However, as her symptoms persisted—including severe vertigo, nausea, head pain, and dizziness—she was also referred to a physical therapist and neurologist.

24. Plaintiff's mental stamina also suffered as her injuries caused extreme fatigue, dizziness, nausea, stress, and anxiety. This made it much more difficult to perform the normal functions of her life, including her professional work as an attorney. Specifically, Plaintiff was forced to take time off, and work reduced hours in her Associate General Counsel position.

//
//
//

25. Even after she returned to work, Plaintiff had difficulty performing her work, and was forced to limit her non-work schedule and commitments so that she could complete her tasks despite her ongoing serious symptoms.

26. Plaintiff's injuries also prevented her from cooking, reading, driving, socializing, or walking more than a short distance in the aftermath of the injury. Plaintiff could not, and is still unable to even rest flat on her back or on her left side due to the pain and dizziness it causes.

27. Plaintiff was further forced to cancel a long-anticipated trip in October 2017, incurring both the distress of missing a birthday vacation with her mother and daughter, and unreimbursed travel costs.

**Plaintiff's Ongoing Injuries**

28. Plaintiff has now undergone a CT scan, an MRI, and has been diagnosed with post-concussion syndrome. She continues to receive medical treatment in an attempt to address her ongoing symptoms.

29. Plaintiff's quality of life continues to be negatively, and significantly, impacted by her injury. Nearly two years later, she continues to experience chronic head and nerve pain, dizziness, and other symptoms. For instance, in February 2019, without any known trigger, she experienced a sharp increase in pain at the site of her head injury, with nerve pain radiating through her scalp. After examination, her neurologist concluded that because the nerves in her head were damaged from the concussion, she would always be susceptible to increased head pain.

30. Whereas before the concussion Plaintiff was very physically and mentally active, she now struggles to achieve the same level of mental and physical capacity. Most notably, sustained concentration and computer work trigger dizziness and headaches.

31. Accordingly, after nearly nine months of severe head pain, dizziness and other symptoms—worsened by the demands of her job—Plaintiff was forced to leave an interesting, high-paying position that she had previously enjoyed greatly. Absent her injury, Plaintiff anticipated continuing in her position for many more years.

32. Plaintiff continues to suffer chronic, permanent head pain and dizziness, and is consequently limited in her head movements. Plaintiff can no longer do many things she used to

enjoy such as yoga. Plaintiff cannot do exercises or routine tasks that require her to either lie flat or invert her head.

33. Even Plaintiff's capacity to handle sustained work, and stressful life events, is much more limited than before the incident.

***Defendants' Knowledge of Safety Risks***

34. In October 2017, Plaintiff submitted a report regarding the Ladder failure to the Consumer Protection Safety Commission ("CPSC"). The CPSC sent an inspector to Plaintiff's home to perform an in-depth investigation of the incident. On information and belief, the CPSC shared the report and/or investigation notes with Defendants, but Plaintiff was never informed of Defendants' response to the report.

35. Indeed, just last year, Defendants recalled a similar aluminum ladder because "[t]he ladders can break while in use, posing a fall hazard to the user." *See* https://www.cpsc.gov/Recalls/2018/Werner-Recalls-Aluminum-Ladders-Due-to-Fall-Hazard.

36. But Defendants had been aware of the types of dangers its ladders present for many years before Plaintiff's incident. A man in Texas, for example, suffered severe and permanent injuries in 2011 when an aluminum ladder designed and manufactured by Defendants collapsed in the same manner as Plaintiff's: one of the ladder's legs bent and failed. *See Devallee v. Werner Co.*, Case No. 2011-40709-362 (442nd District Court, Denton County, TX).

37. Further, reports on SaferProducts.gov identifying similar concerns and injuries involving Werner ladders date back to 2011. For instance, in August 2011 a woman reported that one of Defendants' ladders "stretched" at the top hinge, causing the ladder to collapse. *See* SaferProducts.gov, Report Number 20110718-9B216-1192032.

38. Also in August 2011, a man reported that a ladder he had purchased from Defendants became unsteady while he was off the ground. He found that two bolts had "broken in half." *See* SaferProducts.gov, Report Number 20110818-58279-2147476105

39. In April 2012, a man reported finding "stress fractures" at the rung attachment points on one of Defendants' ladders. *See* SaferProducts.gov, Report Number 20120411-4AB58-1242968.

40. In December 2012, a man reported that a Keller brand, Commercial Type II ladder, similar to Plaintiff's Ladder, had collapsed because the legs bent. *See* SaferProducts.gov, Report Number 20121213-869FF-1290180.

41. In November 2016, a woman reported a ladder failure very similar to Plaintiff's experience, during which the ladder legs collapsed despite being locked in place and on solid ground. *See* SaferProducts.gov, Report Number 20161114-4621D-2147410783.

42. Similar reports appear on the internet, at https://Werner-Ladder.Pissedconsumer.com/review.html, dating back to at least 2009, and continuing until this year. Consumers repeatedly described serious injuries resulting from ladder failures just like Plaintiff's. One report, for instance, described an individual who was injured in 2009 when the step of an aluminum ladder collapsed beneath him. (Review #226610).

**FIRST CAUSE OF ACTION**
**(NEGLIGENCE)**

43. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

44. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of its Ladders into the stream of commerce, including a duty to assure that its products would not cause users to suffer injuries such as Plaintiff's.

45. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of the Ladders into interstate commerce in that Defendants knew or should have known that the Ladders presented a high risk of unreasonable danger including, but not limited to, the tendency of the Ladders' side legs and diagonal braces failing while in use, causing severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

46. The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a. Manufacturing and/or designing the Ladders without thorough and sufficient testing;
   b. Negligently designing the Ladders in a manner which was dangerous to their users; and
   c. Negligently manufacturing the Ladders in a manner which was dangerous to their users.

47. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

48. Defendants' negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer. Plaintiff's injuries include, but are not limited to permanent physical pain and mental anguish, diminished enjoyment of life, lost earnings, and financial expenses for medical treatment and care.

49. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, and all relief as this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**(STRICT PRODUCTS LIABILITY—DESIGN DEFECT)**

50. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

51. At all times herein mentioned, Defendants developed, designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed the Ladders, one of which was used by Plaintiff as herein described.

52. Defendants' Ladders were expected to and did reach the usual and intended consumers, including Plaintiff, without substantial change in the condition in which the Ladders were produced, manufactured, sold, and distributed by Defendants.

53. At those times, the Ladders were in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff.

54. The Ladders designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design in that, when they left Defendants' possession and control, the foreseeable risks exceeded the benefits associated with the design of the Ladders.

55. The Ladders designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design in that, when they left Defendants' possession and control, they were unreasonably dangerous in normal use and more dangerous than an ordinary consumer would expect.

56. The Ladders designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design in that, when they left Defendants' possession and control, there was an alternative design safer than the Ladders' actual design, which was as practical and as economically feasible as the Ladders' design, while retaining the Ladders' primary purpose.

57. At all times herein mentioned, the Ladders were in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, the Ladders were defective in the following ways:

   a. When placed in the stream of commerce, the Ladders were defective in design and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;
   b. When placed in the stream of commerce, the Ladders contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;
   c. Defendants did not sufficiently test, investigate, or study the Ladders;
   d. Use of the Ladders presents a risk of injury that outweighs any potential utility stemming from the use of the Ladders;

e. Defendants knew or should have known at the time of marketing, selling, and/or distributing the Ladders that they could cause serious injuries; and

f. Defendants did not conduct adequate post-marketing surveillance of the Ladders.

58. Defendants knew, or should have known that at all times herein mentioned the Ladders were in a defective condition, and therefore were and are inherently dangerous and unsafe.

59. Despite this knowledge, Defendants voluntarily designed the Ladders with a dangerous condition for use by the public, and in particular Plaintiff.

60. Plaintiff used the Ladder, as described above, without knowledge of the Ladders' dangerous characteristics.

61. At the time of Plaintiff's incident, she was using the Ladder for the purpose and in a manner normally intended for its use.

62. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

63. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

64. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established risks inherent with its normal, intended use.

65. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

66. Plaintiff could not, by the exercise of reasonable care, have discovered the Ladder's defects herein mentioned or perceived its danger.

67. Defendants' defective design of the Ladder amounts to willful, wanton, and/or reckless conduct.

68. Defects in Defendants' Ladders were the cause or a substantial factor in causing Plaintiff's injuries.

69. As a result of the foregoing acts and omission, Plaintiff suffered, and will continue to suffer, injuries, harm and economic loss including, but not limited to, permanent physical pain and mental anguish, diminished enjoyment of life, lost income, and financial expenses for medical treatment and care.

70. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

## (STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT)

71. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if fully set forth herein.

72. At all times herein mentioned, Defendants developed, designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed the Ladders, one of which was used by Plaintiff as herein described.

73. Plaintiff's Ladder was expected to and did reach its usual and intended consumers when it was purchased by Plaintiff without substantial change in the condition in which the Ladder left Defendants' possession and control.

74. At the time the Ladder left Defendants' possession and control it contained a manufacturing defect, in that it varied, and did not conform to the other Ladders developed, designed, researched, manufactured, tested, advertised, promoted, sold, and/or distributed by Defendants.

75. Even if the design of the Ladders did not itself present an inherent risk of danger and injury—which, as Plaintiff alleges above, they did—the specific Ladder purchased by Plaintiff was defective because it differed from the other Ladders manufactured by Defendants, which variations include but are not limited to use of defective raw materials, and/or defective construction.

76. Plaintiff used her Ladder without knowledge of the dangerous characteristics introduced by Defendants' defective manufacturing.

77. At the time of Plaintiff's incident, she was using the Ladder for the purpose and in a manner normally intended for its use.

78. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

79. Defendants created a product that, due to its defective manufacture, was and is unreasonably dangerous for its normal, intended use.

80. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

81. Plaintiff could not, by the exercise of reasonable care, have discovered her Ladder's manufacturing defects or perceived the dangers they presented.

82. Defendants' defective manufacture of Plaintiff's Ladder amounts to willful, wanton, and/or reckless conduct.

83. Defects in the manufacture of Plaintiff's Ladder were the cause or a substantial factor in causing Plaintiff's injuries.

84. As a result of the foregoing acts and omission, Plaintiff suffered, and will continue to suffer, injuries, harm and economic loss including, but not limited to, permanent physical pain and mental anguish, diminished enjoyment of life, lost income, and financial expenses for medical treatment and care.

85. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, and all relief as this Court deems just and proper.

//
//
//
//
//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action and requests:

a. Compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

b. Compensatory damages including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

c. Economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

d. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendants which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

e. Pre-judgment interest;

f. Post-judgment interest;

g. The costs of these proceedings; and

h. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

//
//
//
//
//

Dated:  August 29, 2019    ANDRUS ANDERSON LLP

By: _____
Lori E. Andrus

Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Leland H. Belew (SBN 293096)
leland@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

*Attorneys for Plaintiff*